UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KEITH GRIFFIN,

        Plaintiff,                       CASE NO.: 4:12cv51-RH/WCS

v.

CITY OF TALLAHASSEE, et al.,

        Defendants.

_____/

## THE CITY OF TALLAHASSEE'S MEMORAUNDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Comes now the defendant, THE CITY OF TALLAHASSEE (the City), by and through undersigned counsel, and pursuant to Rule 56, Federal Rules of Civil Procedure, N.D. Fla. Loc. R. 56.1, and N.D. Fla. Loc. Rule 7.1(A), moves this Court for the entry of summary judgment as to Counts IV, V, and VI of plaintiff's amended complaint (complaint) in its favor and against plaintiff.  As grounds for this Motion, the City states:

## I.    SUMMARY JUDGMENT STANDARD

In all probability, this Court is well versed in the standard that applies to Motions for Summary Judgment under Rule 56, Fed.R.Civ.P. Essentially, to defeat this motion, plaintiff must come forward with sufficient evidence of every element

that he must prove to prevail at trial.[1] This Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[2] "A motion for judgment as a matter of law will be denied only if 'reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions.'"[3] In the present case, it is clear that if trial were held tomorrow, plaintiff could not meet the affirmative evidentiary requirements needed to prove his claims against the City.

## II.    STATEMENT OF FACTS

The City hereby adopts and incorporates herein in its entirety and specifically makes a part hereof Part I, Statement of Facts, set out in the individual defendants' Memorandum of Law in support of defendants' Motion for Summary Judgment.

Since May 22, 2007, Dennis Jones (Chief Jones) has been employed as the Police Chief with the City's Police Department (TPD). Prior to his employment with TPD, he was employed as the Police Chief of Daytona Beach, Florida, and prior thereto he had been employed in various capacities as a law enforcement officer beginning in October 1978.  Chief Jones is a former member of the

---

[1]      Rollins v. Tech South, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).
[2]      Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997), cert. denied sub. nom. Combs v. Meadowcraft, 522 U.S. 1045 (1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).
[3]      Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999), cert. denied 120 S.Ct. 1674 (2000) (quoting Walker v. Nations Bank of Florida, N.A., 53 F.3d 1548, 1555 (11th Cir. 1995)).

Standards Commission for the Florida Criminal Justice Standards and Training Commission. As to all matters but ultimate discipline, Chief Jones was and is the final decision-maker for TPD. He is also the agency head of TPD and in that capacity has personal knowledge of its policies, procedures, and training programs, including those in effect prior to becoming agency head.[4]

## A.   TRAINING

At all times relevant hereto, TPD maintained an extensive training program for newly hired police officers. Before an individual could begin work as a police officer with TPD, several criteria had to have been met. First, the candidate had to have completed law enforcement training at a Florida Criminal Justice Standards and Training Commission (CJSTC)-certified training center pursuant to Chapter 943, Florida Statutes. Second, the candidate had to have taken and successfully passed the state certification exam (known as the State Officer Certified Exam) prior to becoming certified by the CJSTC. Third, the candidate had to have completed approximately three weeks in TPD's in-house training program that consisted of training in the classroom and approximately 14 weeks of training in the field with a Field Training Officer (FTO). Fourth, each candidate was placed on probation where on-the-job performance was regularly reviewed and evaluated to determine whether the candidate would achieve permanent status as an officer.

---

[4]       Exhibit N, ¶ 2.

Officers who did not satisfy these criteria were not retained. Investigator Washington satisfied these criteria at the time she was hired.[5]

At a minimum, every TPD police officer, including Investigator Washington, must successfully complete training in various topics, including areas relating to investigations, arrests, the constitutional requirement that an arrest must be based upon adequate probable cause and that no official document may be prepared, submitted or filed that is not true and correct. A yearly in-service training is also provided to TPD officers addressing a variety of topics, including proper investigations and arrests.   Each police officer is and was also well trained, counseled, encouraged, and always expected to uphold the law, not to break the law.[6]

In addition to the above required formal training, TPD investigators, including Investigator Washington, go through additional formal training from outside organizations that assist them as they enter and work in TPD's Criminal Investigation Department (CID). By way of example, Investigator Washington took advanced courses in (a) Interview and Interrogation in December 2008; (b) Computer and Technology in Criminal Justice in February 2009; (c) Analytical Investigative Techniques in July 2009; (d) TPD's Incident Command for Criminal Investigations in March 2009; (e) Law Enforcement Computer Forensics in April

---

[5]        Exhibit N, ¶ 3.
[6]        Exhibit N, ¶ 4.

2009; (f) Financial Investigative Techniques in August 2009; (g) Advanced Body Language Techniques in November 2009; and (h) Interviewing Through Statement Strategies in September 2010. Further, TPD investigators participate in a mandatory new member orientation and receive a copy of the CID's standard operating procedures.[7]

Chief Jones was unaware of, and there is no indication that the Office of the Chief of Police was or has ever been made aware of, any concerns regarding the training or performance of Investigator Washington or that she needed any additional training or anything but normal supervision and monitoring.[8]

At all times relevant hereto, Investigator Washington was recognized as an excellent employee and as being well-qualified, well-trained, and professional in the performance of her duties. At all times relevant hereto, Investigator Washington's written evaluations demonstrate a pattern of outstanding performance. For example, for the rating period September 1, 2009 through August 31, 2010, Investigator Washington received an overall rating of "Consistently Exemplary" (Level 5), the highest rating one can achieve. Investigator Washington received an overall rating of "Consistently Goes Beyond" (Level 4) for the rating

---

[7]      Exhibit N, ¶ 5.
[8]      Exhibit N, ¶ 6.

periods of September 1, 2008 through August 31, 2009 and September 1, 2007

through August 31, 2008.[9]

## B.     SUPERVISION/DISCIPLINE

At all pertinent times herein TPD had established and enforced a set of

written policies and standard operating procedures that regulated the conduct,

supervision and corrective action of TPD officers.[10] Each TPD officer was part of a

set chain of command and was supervised by his/her Sergeant, who is the first

level supervisor, a lieutenant, a Captain (District Commander), a Major (Bureau

Commander), a Deputy Chief, and the Chief of Police.[11]

Each supervisor was charged with the responsibility of providing police

officers with adequate training in the various police officer skills, capable direction

and guidance, and diligent supervision.  Command staff emphasized the need for

quality direction and supervision provided at the direct supervisor (Sergeant)

level.[12]  TPD Sergeants directed and observed the officers' daily actions and

corrected those actions where deficient.  Sergeants utilized progressive discipline

in correcting deficiencies, which included counseling, remedial training and if

uncorrected, making recommendations of discipline.[13]

---

[9]      Exhibit N, ¶ 7.
[10]     Exhibit N, ¶ 8.
[11]     Id.
[12]     Exhibit N, ¶ 9.
[13]     Exhibit N, ¶ 10.

Additionally, at all times relevant hereto, TPD utilized an Early Warning Program that identified officers with possible deficiencies that could have become problems. Any officer identified through this program would have received additional remedial measures to address such deficiencies. Prior to May 5, 2008, Investigator Washington was never identified as needing remediation through this program.[14]

Chief Jones was unaware of, and there is no indication that the Office of the Chief of Police was or has ever been made aware of, any issue prior to the circumstances giving rise to the instant case involving Investigator Washington where she was alleged to have: (a) misrepresented information in an Arrest/Probable Cause Affidavit (PC Affidavit), or any other document; (b) omitted material information in an PC Affidavit or any other document; (c) failed to follow or ignore the requirements of a General Order; (d) illegally caused the arrest of a citizen; or (e) maliciously caused the prosecution of a citizen. Chief Jones has never been advised by any administrative, supervisory, or command staff that they ever had knowledge of such conduct by TPD officers, supervisors, or investigators, including Investigator Washington.[15]

Similarly, Chief Jones was unaware of, and there is no indication that the Office of the Chief of Police was or has ever been made aware of, any issue prior

---

[14] Exhibit N, ¶ 11.
[15] Exhibit N, ¶ 12.

to the circumstances giving rise to the instant case involving CID supervisors, including Investigator Washington's supervisor, where the supervisor or Investigator Washington was alleged to have: (a) not thoroughly reviewed a PC Affidavit; (b) failed to follow protocols applicable to TPD with respect to the review of a PC Affidavit; or (c) failed to take corrective action following the review of a PC Affidavit. Chief Jones has never been advised by any administrative or command staff that they had ever had knowledge of such conduct by supervisors of TPD officers or investigators, or of such conduct by Investigator Washington.[16]

Chief Jones was also unaware of, and there is no indication that the Office of the Chief of Police was or ever has been made aware of, any issue relating to a TPD officer or investigator, including Investigator Washington, implementing a policy of TPD in such a manner that a PC Affidavit contained misrepresentations of fact or material omissions.[17]

At all times relevant hereto, TPD maintained policies and procedures for handling citizen inquiries and complaints made against TPD officers. Chief Jones was unaware of, and there is no indication that the Office of the Chief of Police was or has ever been made aware of, any issue prior to the circumstances giving rise to the instant case where TPD's Internal Affairs Section refused to investigate

---

[16]        Exhibit N, ¶ 13.
[17]        Exhibit N, ¶ 14.

a documented citizen inquiry or complaint. The Internal Affairs Section at TPD has been in existence since the early 1970's. Keith Griffin did not file a citizen complaint or inquiry through TPD's Internal Affairs Section. TPD's Internal Affairs section has never received a complaint alleging that Investigator Washington crafted or submitted a PC Affidavit that contained misrepresentations of fact or material omissions.[18]

Chief Jones was unaware of, and there is no indication that the Office of the Chief of Police was or has ever been made aware of, any issue prior to the circumstances giving rise to the instant case where TPD maintained or tolerated a policy, practice, or custom of its police officers depriving citizens of their constitutional rights, including, but not limited to, the right to be free of unlawful arrests and/or malicious prosecutions. Chief Jones has never been advised by any administrative or command staff that they had ever had knowledge of such conduct by TPD officers or investigators, including Investigator Washington.[19]

Chief Jones was unaware of, and there is no indication that the Office of the Chief of Police was or has ever been made aware of, any issue prior to the circumstances giving rise to the instant case where TPD maintained or tolerated a policy, practice, or custom of its police officers overvaluing the solving of crimes, including rewarding officers for making numerous arrests, or rewarding

---

[18]    Exhibit N, ¶ 15.
[19]    Exhibit N, ¶ 16.

investigators for closing cases. Chief Jones has never been advised by any administrative or command staff that they ever had knowledge of such conduct by TPD officers or investigators, including Investigator Washington.[20]

Chief Jones was unaware of, and there is no indication that the Office of the Chief of Police was or has ever been made aware of, any issue prior to the circumstances giving rise to the instant case where TPD maintained or tolerated a policy, practice, or custom of its police officers omitting material information from PC Affidavits or misrepresenting information in a PC Affidavit. Chief Jones has never been advised by any administrative or command staff that they had ever had knowledge of such conduct by TPD officers or investigators, including Investigator Washington.[21]

Chief Jones was unaware of, and there is no indication that the Office of the Chief of Police was or has ever been made aware of, any issue prior to the circumstances giving rise to the instant case where TPD maintained or tolerated a policy, practice, or custom of its police officers ignoring TPD General Orders or failing to monitor compliance with TPD General Orders. Chief Jones has never been advised by any administrative or command staff that they had ever had

---

[20]    Exhibit N, ¶ 17.
[21]    Exhibit N, ¶ 18.

knowledge of such conduct by TPD officers or investigators, including Investigator Washington. [22]

Chief Jones was unaware of, and there is no indication that the Office of the Chief of Police was or has ever been made aware of, any issue prior to the circumstances giving rise to the instant case where TPD maintained or tolerated a policy, practice, or custom of its police officer and investigator supervisors failing to thoroughly review PC Affidavits, failing to take corrective action following a review of PC Affidavits, or failing to provide appropriate instruction and supervision of the process by which PC Affidavits are assembled and executed. Chief Jones has never been advised by any administrative or command staff that they had ever had knowledge of such conduct by TPD officers or investigators.[23]

TPD had in place in 2010 a set of written directives that established guidelines, policies and procedures for each TPD officer, including a policy relating to arrests, investigations, training, supervision and discipline and the investigation of complaints against officers (Internal Affairs).[24]

While there have been a few lawsuits since Chief Jones became Police Chief that have alleged a violation of various TPD policies and/or complaints related to interactions with TPD officers, including claims of negligence, Chief Jones is unaware of any substantiated claim of a systemic policy or custom within TPD to

---

[22]     Exhibit N, ¶ 19.
[23]     Exhibit N, ¶ 20.
[24]     Exhibit N, ¶ 21.

violate constitutional rights prior to the circumstances giving rise to the instant case.[25]

At all times relevant hereto, TPD's General Orders have not come under scrutiny during self-assessments and reviews by outside accreditation organizations, nor has the failure to adopt or promulgate a General Order or policy come under scrutiny by outside accreditation organizations. Such organizations have never found that TPD has been negligent in its promulgation of General Orders or policies.[26]

TPD has been accredited by the Commission on Accreditation for Law Enforcement Agencies (CALEA). Only approximately 10% of all Florida municipal law enforcement agencies, and approximately 3% of all local, state and federal law enforcement agencies, are CALEA-accredited. There are five phases in the accreditation process: (a) Enrollment; (b) Self-assessment; (c) On-site Assessment; (d) Commission Review and Decision; and (e) Maintaining Compliance and Reaccreditation.  The CALEA accreditation evaluation process includes an on-site review by assessors every three years. TPD was first accredited by CALEA in 1986.  At no time during the CALEA accreditation process or the self-assessment periods surrounding the accreditation process have TPD's General Orders or failure to promulgate General Orders relating to the following areas

---

[25]      Exhibit N, ¶ 22.
[26]      Exhibit N, ¶ 23.

come under scrutiny: (a) standards for supervisor review of PC Affidavits; (b)

standards and procedures for ensuring the responsibilities of supervisors are being

carried out appropriately relative to the PC Affidavit process; (c) standards and

procedures for ensuring that supervisors are requiring the appropriate amount of

factual support and investigative documentation be included in a PC Affidavit; or

(d) standards and procedures for ensuring that TPD employees are properly trained

and/or supervised and/or monitored.[27]

TPD is also accredited by Commission for Florida Law Enforcement

Accreditation, Inc. (CFA). The CFA is patterned, in part, after CALEA and designs

a series of professional standards for Florida law enforcement agencies to emulate.

Participant agencies must undergo rigorous evaluation of their policies, procedures,

and protocols in a wide variety of law enforcement service areas. Pursuant to the

CFA accreditation standards, to be accredited TPD must continuously demonstrate

compliance with all applicable mandatory standards and not less than 80% of

applicable non-mandatory standards. TPD was first accredited by CFA on May 22,

2002, and was reaccredited on June 29, 2005; February 20, 2008; and February 3,

2011. At no time during the CFA accreditation process or the self-assessment

periods surrounding the accreditation process have TPD's General Orders or

failure to promulgate General Orders relating to the following areas come under

---

[27]        Exhibit N, ¶ 24.

scrutiny: (a) standards for supervisor review of PC Affidavits; (b) standards and procedures for ensuring the responsibilities of supervisors relative to the PC Affidavit process are being carried out appropriately; (c) standards and procedures for ensuring that supervisors require the appropriate amount of factual support and investigative documentation be included in an PC Affidavit; or (d) standards and procedures for ensuring that TPD employees are properly trained and/or supervised and/or monitored.[28]

TPD is the fourth longest nationally CALEA-accredited law enforcement agency in the Country. In 2011, TPD achieved "flagship status," meaning that it attained the highest possible rating by CALEA in the accreditation process.[29]

Chief Jones was unaware of, and there is no indication that the Office of the Chief of Police was or has ever been made aware of, any issue prior to the circumstances giving rise to the instant case wherein TPD has been advised that the failure to promulgate a General Order has led to the violation of a citizen's rights. Similarly, Chief Jones was unaware of, and there is no indication that the Office of the Chief of Police was or has ever been made aware of, any issue prior to the circumstances giving rise to the instant case wherein TPD been advised that its training programs, or failure to train its officers and Investigators regarding a particular subject, has led to the violation of a citizen's rights.  Similarly, Chief

---

[28]     Exhibit N, ¶ 25.
[29]     Exhibit N, ¶ 26.

Jones was unaware of, and there is no indication that the Office of the Chief of Police was or has been made aware of, any issue prior to the circumstances giving rise to this case wherein TPD has been advised that the process by which the need for certain policies are identified or that the process by which policies are promulgated is deficient.[30]

Chief Jones was unaware of, and there is no indication that the Office of the Chief of Police was or has ever been made aware of, any issue prior to the circumstances giving rise to the instant case of TPD officers engaging in conduct that could result in material information being omitted from a PC Affidavit, or of misrepresentations being included in a PC Affidavit.  Nor has Chief Jones ever authorized, tolerated, or permitted any TPD officers and investigators to engage in such conduct.[31]

Chief Jones was unaware of, and there is no indication that the Office of the Chief of Police has ever authorized, tolerated, or permitted TPD officers and investigators to engage in such conduct. Chief Jones was never advised by any administrative or command staff that they had ever had knowledge of such conduct by TPD officers or investigators, including Investigator Washington.[32]

---

[30]     Exhibit N, ¶ 27.
[31]     Exhibit N, ¶ 28.
[32]     Exhibit N, ¶ 29.

## IV.   ARGUMENT

## A.   PLAINTIFF HAS NOT SHOWN THE EXISTENCE OF A CITY POLICY OR CUSTOM OF ALLOWING ITS POLICE OFFICERS TO FALSIFY OFFICAL DOCUMENTS OR ARREST CITIZENS WITHOUT PROBABLE CAUSE

It is undisputed that the City had no official policy allowing its police officers to falsify official documents or arrest citizens without probable cause. Thus, plaintiff can establish a § 1983 claims against the City only by proving the existence of a custom of allowing its police officers to engage in such misconduct and that the custom caused Investigator Washington to falsify official documents or to cause plaintiff's arrest without probable cause.[33] Plaintiff cannot rely on a theory of respondeat superior to hold the City liable for the actions of its officers.[34]

To prove his claim that the City had a custom of allowing its officers to falsify official documents or arrest citizens without probable cause, plaintiff must prove that TPD failed or refused to receive, investigate or act on complaints that its officer falsified documents or arrested citizens without probable cause. Thus, plaintiff must prove: (1) that Investigator Washington falsified official documents and caused plaintiff's arrest without probable cause; (2) the existence of a

---

[33]      Monell v. Dept. of Social Services, 436 U.S. 658, 691 (1978); Grech v. Clayton County, Ga., 335 F.3d 1326, 1329-30 (11th Cir. 2003).

[34]      Monell, 436 U.S. at 691.

continuing, persistent, and widespread practice of the same or very similar

misconduct by TPD police officers prior to October 20, 2010; (3) deliberate

indifference to or tacit approval of such misconduct by the City's final

policymaker after notice of that particular misconduct;[35] and (4) that the custom

was the moving force behind the alleged falsification of official documents and

plaintiff's arrest without probable cause.[36] Random acts or isolated incidents are

generally insufficient to show a widespread practice.[37]

Here, plaintiff has not, and in fact cannot, present any admissible evidence:

(1) of a widespread practice of TPD officers falsifying official documents or

arresting citizens without probable cause, as is alleged in the instant case, (2) that

the City had knowledge (actual or constructive) of the alleged practice, (3) that the

City tacitly authorized the alleged practice, or (4) that the City was deliberately

indifferent towards the alleged practice. In fact, the undisputed evidence shows that

at all material times herein the City (TPD) maintained and enforced specific

written policies relating to arrests, crime investigations, document preparation and

officer conduct that prohibited the alleged misconduct.

---

[35]     Dennis Jones, TPD's Chief of Police on July 28, 2007, was the City's final policymaker in all instances except for ultimate discipline.

[36]     City of Canton v. Harris, 489 U.S. 378, 389-91(1989); Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991).

[37]     Church v. City of Huntsville, 30 F.3d 1332, 1345 (11th Cir.1994); Depew v. City of St. Marys, 787 F.2d 1496, 1499 (11th Cir. 1986); Griffin v. City of Opa-Locka, 261 F.3d 1295, 1308 (11th Cir. 2001) (quoting Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir.1987)).

**B.     PLAINTIFF HAS FAILED TO PRESENT ADMISSIBLE EVIDENCE
TO PROVE HIS CLAIM OF FAILURE TO TRAIN/
SUPERVISE/DISCIPLINE**

The law is clear that there are only "limited circumstances" where a
municipality can be liable under § 1983 for failure to train/supervise/discipline
(hereinafter failure to train) its employees.[38]  To prevail on his failure to train
claim, plaintiff must establish that the alleged failure was a City custom, and that
custom caused Investigator Washington to violate plaintiff's constitutional rights.
Failure to train only becomes "deliberate" where in light of the duties assigned to
specific officers "the need for more or different training/supervision is so obvious,
and the inadequacy so likely to result in the violation of constitutional rights, that
the City's policy makers can reasonably be said to have been deliberately
indifferent to the need."[39]

Plaintiff has not, and cannot, present any admissible evidence to support his
failure to train claim. The undisputed evidence shows that at all material times
herein that TPD maintained and enforced specific written policies relating to
training/supervision in numerous areas, including arrests, investigations, report
writing, and personal conduct.

In <u>Connick</u> the Supreme Court cautioned that a City's "culpability for a
deprivation of rights is at its most tenuous where a claim turns on a failure to

---

[38]     <u>Connick v. Thompson</u>, 563 U.S. ___, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417(2011); <u>Canton</u>, *supra*, 489
U.S. at 389-91; <u>Kerr v. City of West Palm Beach</u>, 875 F.2d 1546, 1555 (11th Cir. 1989).
[39]     <u>Riley v. Newton</u>, 94 F.3d 632, 638 (11th Cir. 1996) (citing <u>Canton</u>, at 390).

train."[40]  The Court also emphasized that a plaintiff must prove a pattern of similar violations sufficient to establish that the policy of inaction was the functional equivalent of a decision by the City itself to violate the Constitution.[41] The Court reiterated that deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.[42]  Finally, the Court pointed out that, "'[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a §1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.'"[43]

## C.   PLAINTIFF HAS FAILED TO PROVE A CAUSAL LINK BETWEEN A CITY CUSTOM AND THE ALLEGED CONSTITUTIONAL VIOLATION

In general, for plaintiff to recover from the City under § 1983, he must satisfy a "rigorous" standard of causation;[44] and he must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights."[45] Plaintiff has not met (and cannot meet) this rigorous standard of causation.

The City may be held liable in a § 1983 claim premised on deliberate indifference "where a deliberate choice to follow a course of action is made from

---

[40]      Connick, 131 S.Ct. at 1359 (citing Oklahoma City v. Tuttle, 471 U.S. 808, 822–823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell")).
[41]      Id. at 1360.
[42]      Id. at  1359.
[43]      Id. at 1363.
[44]      Board of the County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 405 (1997).
[45]      Id. at 404.

among various alternatives by the official or officials responsible for establishing final policy **with respect to the subject matter in question**."[46] This requirement has been interpreted in the Eleventh Circuit to require a plaintiff to offer evidence "that the municipality knew of a need to train/supervise . . . **in a particular area** and the municipality made a deliberate choice not to take any action."[47] If plaintiff cannot show that the City had notice of a need to train/supervise regarding a specific practice, the City "is not liable as a matter of law for any failure to train."[48]

Plaintiff has not presented, and cannot present, any evidence showing that the City had notice of a need to train/supervise in the particular area of proper determination of sufficient probable cause to obtain an arrest warrant and not arresting citizens without probable cause. In fact, the undisputed evidence shows that the City had no knowledge of a need for additional or remedial training/supervision in those particular areas.[49]

In contrast to plaintiff's vague and factually unsupported allegations, the undisputed facts in the record demonstrate that all TPD officers, including Investigator Washington, had completed training initially required of all officers as well as additional training in various fields and annual training.  Plaintiff has not

---

[46]    Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (emphasis added); Bryan County, 520 U.S. at 406-08; Young v. City of Augusta, GA, 59 F.3d 1160, 1171-72 (11th Cir. 1995); Church, 30 F.3d at 1342-46.
[47]    Gold v. City of Miami, 121 F.3d 144, 1350-51 (11th Cir. 1997) (Emphasis added).
[48]    Id. at 1351; Wright v. Shepperd, 919 F.2d 665, 674 (11th Cir. 1990) (noting the City cannot be liable when there is "no evidence of a history of widespread prior abuse. . . [which] would have put [the City] on notice of the need for improved training or supervision."); Popham v. City of Talladega, 908 F.2d 1561, 1564-65 (11th Cir. 1990).
[49]    Generally see Exhibit N.

presented, and cannot present, any evidence to establish that the City made a

conscious choice not to train its officers reflecting deliberate indifference to the

constitutional rights of its citizens as is required by <u>City of Canton.</u>[50]

**D.     PLAINTIFF HAS NO CLAIM AGAINST THE CITY FOR
        NEGLIGENT ENFORCEMENT/IMPLEMENTATION OF POLICIES**

**1.     FLORIDA COURTS DO NOT RECOGNIZE A NEGLIGENT
        ENFORCEMENT/IMPLEMENTATION OF POLICES CLAIM**

It is well settled in Florida that there is no cause of action for negligent

enforcement/implementation of policies.[51]  As this Court pointed out in <u>Vaden</u>,

"The failure to follow policy may be evidence of other actionable negligence-such

as the duty to use reasonable care in supervising or retaining an employee-but a

policy does not itself create an independent duty of care."[52]  Here, plaintiff has

brought no state law claims of either negligent supervision or retention.

**2.     THE NEGLIGENT ENFORCEMENT OF POLICIES CLAIM IS
        ALSO BARRED BY SOVEREIGN IMMUNITY**

Plaintiff's claim that the City failed to follow/implement applicable policies-

when considered alone and not in conjunction with a failure to perform a

separately actionable duty, such as the duty to use reasonable care in supervising

an employee-is also barred by sovereign immunity.[53]  And again, this Court

---

[50]     <u>Id.</u>
[51]     <u>Vaden v. Campbell</u>.  2009 WL 1919474 *5 (N.D. Fla. 2009) citing <u>Pollock v. Florida Department of Highway Patrol</u>, 882 So. 2d 928, 936 (Fla. 2004).
[52]     <u>Vaden</u> at *5.
[53]     <u>Id.</u>

explained clearly why such a claim is barred by sovereign immunity:  "This is so because the enactment and implementation of policies involves 'the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved.'"[54]  The City is entitled to summary judgment in its favor and against plaintiff on Count V of plaintiff's complaint.

## E.   PLAINTIFF HAS NO STATE LAW CLAIM AGAINST THE CITY FOR FALSE IMPRISONMENT

The City adopts the arguments by the individual defendants in Parts IV A and C as set out in their memorandum of law in support of defendants' motion for summary judgment.  In addition, for the reasons and arguments set forth therein, it is impossible for plaintiff to prove that any of the individual defendants violated his Fourth Amendment right to be free of false arrest/imprisonment.  Therefore, plaintiff has no Monell claim against the City since it is well established that a Monell claim lies against a municipality only after there has been a finding of a constitutional violation by one of its employees/officers.[55]

---

[54]     Id. (citations omitted).

[55]     City of Los Angeles v. Heller, 475 U.S. 796 (1986) ("if a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point"); McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1242 n. 13 (11th Cir. 2003) (where officer's arrest and use of force were constitutionally permissible, there could be no policy or custom of the city that officially sanctioned or ordered a constitutional violation); Cuesta v. School Board of Miami-Dade County, Florida, 285 F.3d 962, 970 n. 8 (11th Cir. 2002) (stating that because Cuesta suffered no deprivation of constitutional rights, court need not decide question of whether county policy might deprive others of constitutional rights); Rooney v. Watson, 101 F.3d 1378, 1381 (11th Cir. 1996) (finding that when the deputy's conduct did not cause plaintiff to suffer a constitutional deprivation, there is no need to inquire into the sheriff's department's policy or custom).

## V.     CONCLUSION

For the foregoing reasons, the City requests this Court grant its motion for summary judgment as to Counts IV, V and VII of plaintiff's complaint and enter judgment in its favor and against plaintiff.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 29th day of June 2012 a true and correct copy of the foregoing has been furnished by electronic mail via CM/ECF to James V. Cook, Esq.

<div style="margin-left:40%">

*/s Billy J. Hendrix*
BILLY J. HENDRIX
Assistant City Attorney
FBN:  849529
City Attorney's Office
300 South Adams Street, Box A-5
Tallahassee, FL 32301
(850) 891-8554
Fax: (850) 891-8973
Billy.Hendrix@talgov.com
ATTORNEYS FOR THE CITY OF
TALLAHASSEE, LAWANA
WASHINGTON, CAROLINE
CAPENTIERI AND REBECCA
BLIZZARD

</div>